UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CASCADES, INC.,

                        Plaintiff,

         -vs-                                **DECISION AND ORDER**
                                                12-CV-851-JTC

EXPERIS FINANCE US, LLC.,

                        Defendant.

---

## **INTRODUCTION**

This matter has been transferred to the undersigned for all further proceedings, by order of Chief United States District Judge William M. Skretny dated July 31, 2014. (Docket No. 62.)

Plaintiff asserts breach of contract and unjust enrichment causes of action in this diversity action. Presently before this Court are the parties' respective motions for summary judgment. The Court finds the motions fully briefed and oral argument unnecessary. For the reasons that follow, Defendant's motion is granted in its entirety, and Plaintiff's motion is denied.

## **BACKGROUND**

On June 29, 2007, Plaintiff Cascades, Inc., entered into a written agreement ("the 2007 agreement") with The Gelber Organization ("Gelber"), a predecessor in interest to Defendant Experis Finance US, LLC, for the performance of tax consulting services. (Def's Stmt of Facts ¶¶ 1, Docket No. 43; Pl's Resp Stmt ¶ 1, Docket No. 52.) A handwritten,

initialed notation next to "Cascades, Inc." on the 2007 agreement's header states "[f]or Cascades Tissue Group in US." (Decl of David D. Leishman, Esq., Ex A, Docket No. 38.) Pursuant to this agreement, Gelber was to identify and assist Plaintiff in obtaining incentives and other benefits "relating to State and Enterprise/Empowerment Zone Incentives, Credits and Savings" not previously claimed by Plaintiff. (*Id.*)  In turn, Gelber would be paid 15% annually of the total savings realized by Plaintiff attributable to Gelber's work. (*Id.*; Def's Stmt of Facts ¶ 32; Pl's Resp Stmt ¶ 32.)   If, however, any such savings became:

> the subject of an audit by a tax or other authority, and are later reversed by such a tax or other authority, [Gelber] shall refund to Client, [Gelber's] fee relating to such reversed Savings within twenty (20) days of such final determination.  To obtain the reimbursement, the Client must notify [Gelber] immediately after the Client has constructive notice that the jurisdiction has challenged the Savings and must allow [Gelber] to participate in the defense of the Savings.

(Leishman Decl Ex A.)   No provision obligated Plaintiff to pay Defendant for its work on an audit defense.  The agreement was binding on the parties' respective successors and assigns, and no amendment would be effective absent a writing signed by both parties.  (*Id.*)

Gelber was acquired by Jefferson Wells in or about August 2008, and this organization subsequently changed its name to Experis Finance US, LLC.[1] (Def's Mem of Law at 2 n. 1, Docket No. 38.)  In January 2009, Defendant Experis notified Plaintiff that it had identified a total of $1,946,010 in savings for the tax years 2005 to 2007. (Def's Stmt of Facts ¶¶ 7, 10; Pl's Resp Stmt ¶¶ 7, 10.)  Plaintiff paid 15% of that amount, $291,902,

---

[1] There is no dispute that the rights and obligations under the 2007 Gelber Agreement were assigned to Defendant.

as a fee. (Def's Stmt of Facts ¶¶ 10-11, Pl's Resp Stmt ¶¶ 10-11.)  Defendant also identified $1,403,545 in savings for tax years 2008 and 2009, for which it invoiced $210,532 as a fee. (Def's Stmt of Facts ¶¶ 12-13, Pl's Resp Stmt ¶¶ 12-13.)

By letter dated March 3, 2010, addressed to "Cascade Tissue Group - New York," the New York State Department of Taxation and Finance ("NYSDTF") stated that it required additional information prior to consideration of the wage tax and Qualified Empire Zone Enterprise ("QEZE") real property credits claimed for the 2005 to 2007 tax years. (Leishman Decl Ex G.)  NYSDTF sent another letter dated August 31, 2010, again requesting additional information "[b]efore any consideration can be given to the [QEZE] refund claims" for these tax years. (*Id.*, Ex H.)  A discrepancy was found in the responsive materials submitted, and NYSDTF requested clarification in a letter dated December 16, 2010. (*Id.*, Ex I.)  In a February 14, 2011 letter, Plaintiff was informed that, because NYSDTF had not received the information requested in its prior letters and phone conversations, the claims for refunds related to tax years 2005 to 2009 were disallowed. (*Id.*, Ex L.)  The letter further states that a request for a conciliation conference may be made "in the event you wish to protest this matter." (*Id.*)  Plaintiff admits that it did not provide Defendant notice of this letter or the prior communication, but asserts that it had no obligation to do so. (Def's Stmt of Facts ¶¶ 18, 20, 22, 24, 26, 28, Pl's Resp Stmt ¶¶ 18, 20, 22, 24, 26, 28.)

In March 2011,[2] Defendant (then named Jefferson Wells) entered into a Master Service Agreement with "Cascades USA, Inc." (Def's Stmt of Facts ¶ 29, Pl's Resp Stmt ¶ 29; Leishman Decl Ex M.) Negotiation of this new agreement was prompted by Plaintiff's desire to discontinue the recurrent 15% payments due each year Plaintiff utilized the tax credits previously identified by Defendant. (Def's Stmt of Facts ¶ 32, Pl's Resp Stmt ¶ 32; Decl of Marrouane Nabih ¶ 10.)  The Master Service Agreement provided, as relevant, that "[t]he specific engagement scope and pricing will be separately documented in the Statement of Work dated March 18, 2011, and any such additional Statement(s) of Work as may be accepted by [Cascades USA, Inc.] from time to time hereafter." (Leishman Decl Ex M.)  Paragraph 13 further states:

> This Agreement and the Statement(s) of Work referred to, as well as any written amendments, shall constitute the entire agreement between the parties and supersede all previous communications; representations, understandings, concurrent or subsequent purchase orders, and agreements, whether oral or written, between the parties or any officer or representative of the parties.  Client has not relied upon any representation other than those set forth in this Agreement and the Statement(s) of Work referred to herein.  In the event of a conflict in the terms between this Agreement and the terms of any Statement(s) of Work, the specific terms of each of the Statement(s) of Work control the respective engagements.

(*Id.*)

The Statement of Work was signed by representatives of Defendant and Cascades USA, Inc., on March 30, 2011. (Def's Stmt of Facts ¶ 30, Pl's Resp Stmt ¶ 30; Leishman Decl Ex N.)  This document begins:

---

[2] The preprinted portion of this agreement states that it was entered into on March 18, 2011, but Plaintiff asserts that it was not in fact signed by any party until March 30, 2011.  The signatures themselves are not dated. (Pl's Resp Stmt ¶ 29; Leishman Decl Ex M.)

> This Statement of Work ("SOW" or "Statement of Work"), including any appendices, schedules, and/or attachments, documents the understanding between [Defendant] and Cascades USA Inc., ("Cascades["] or "Client") with respect to certain services to be performed by [Defendant] related to real estate tax services ("Services"). [Defendant] shall provide the Services pursuant to the provisions of this Statement of Work and [Defendant's] Master Services Agreement, which, together, describe our understanding with respect to the engagement ("Agreement"). This SOW shall replace in its entirety the agreement dated and signed June 29, 2007 between The Gelber Organization and Cascades Inc. (The "Gelber Agreement"), which was assigned to [Defendant] in August 2008. The sum of $210,532.00 due under said Gelber Agreement for credits for the New York Empire Zone Real Property Tax Credit for 2008 and 2009 remain due and payable. [Defendant], its successors, assigns, subsidiaries, affiliate corporations, officers and/or employees hereby release, remise and forever discharge Cascades Inc., and its affiliates for good and valuable consideration, including the payment of the sum of $210,532.00, from any and all obligations related to the Gelber Agreement or from any claim it could have against Cascades relating to the Gelber Agreement. For the purpose of clarity, it is clearly understood between the parties that other than the amount of $210,532.00 due and payable by Cascades Inc. to [Defendant], [Defendant] hereby agree[s] and acknowledge[s] that any amount owing or otherwise payable by Cascades Inc. under the Gelber Agreement as of the date hereof have been paid in full and no further amounts will be payable by Cascades Inc. Upon signature of the Agreement, the Gelber Agreement shall be automatically terminated.

(Leishman Decl Ex N.) The Statement of Work provided that Defendant was to obtain reductions in the real estate property tax assessed valuations impacting the 2011 and 2012 real estate taxes owed by Cascades USA, Inc., and that Defendant would receive a contingency fee of 33% of the tax savings for those two years resulting from its efforts. (*Id.*)

Plaintiff wired approximately $210, 532[3] to Defendant on March 31, 2011. (Def's Stmt of Facts ¶¶ 14-15, Pl's Resp Stmt ¶¶ 14-15.)

---

[3]There appears to be an issue whether this payment was short $322.72, a fact which is irrelevant to the present motions. (See Def's Stmt of Facts ¶15, Pl's Resp Stmt ¶ 15.)

In a letter dated April 4, 2011, NYSDTF requested additional information regarding, among other things, claimed investment tax and QEZE tax reduction credits for the 2008 and 2009 tax years before the claims could be considered. (Leishman Decl Ex O.) Plaintiff admits that it did not provide Defendant notice of this letter, but asserts that it had no obligation to do so. (Def's Stmt of Facts ¶ 36, Pl's Resp Stmt ¶ 36.)

Plaintiff subsequently received from NYSDTF Statements of Tax Reduction or Overpayment, each dated June 14, 2011, disallowing a portion of Plaintiff's QEZE real property tax credit claims for the years 2005 to 2007. (Def's Stmt of Facts ¶ 44, Pl's Resp Stmt ¶ 44; Leishman Decl Exs Q, R, S.) Plaintiff received similar notifications, dated June 27, 2011, for the tax years 2008 and 2009. (Def's Stmt of Facts ¶ 46, Pl's Resp Stmt ¶ 46; Leishman Decl Exs T, U.)

On July 7, 2011, Plaintiff forwarded the June Statements of Tax Reduction or Overpayment to Defendant and demanded a refund of $234,744. (Def's Stmt of Facts ¶ 49, Pl's Resp Stmt ¶ 49; Leishman Decl Ex V.) Defendant reviewed the statements and notified Plaintiff on July 19, 2011 that "[a]lthough we weren't aware, until receipt of the most recent workpapers, that NY was challenging the allowance of the credits, we would like the opportunity to participate in the audit defense." (Leishman Decl Ex W.) Defendant offered to provide 20 hours of professional time, free of charge, in support of an audit defense. *Id.*) Plaintiff and Defendant corresponded regarding the audit defense[4] from September 2011 to December 2011, at which point Defendant informed Plaintiff that further defense work would be billed on an hourly basis. (Nabih Aff ¶¶ 24-28, Ex J.)

---

[4]The record does not reflect whether Plaintiff formally agreed to Defendant's services with the 20-hour limitation.

Further discussions appear not to have taken place until several months later. (Aff of Simon LaChance ¶¶ 9-11, Docket No. 45; Nabih Aff ¶¶ 28-30.) Following a series of conference calls, Plaintiff again demanded that Defendant refund a portion of the fees paid under the 2007 Gelber Agreement. (LaChance Aff ¶11.) In a letter dated May 8, 2012, Defendant stated that, pursuant to the terms of that agreement, Plaintiff was required to provide Defendant with immediate notice of any challenges to claimed tax credits. (LaChance Aff Ex D.) Because Plaintiff had been aware that the identified credits "were under audit as far back as December 2008," two and a half years before Defendant was first notified, Plaintiff was not entitled to a refund. (*Id.*)

On July 9, 2012, Plaintiff filed the instant action in New York State Supreme Court, Erie County, seeking no less than $237,820 in damages. (Docket No. 1.) Defendant removed the matter to this Court on September 6, 2012. (*Id.*) Plaintiff subsequently filed an Amended Complaint alleging that Defendant: (1) breached the 2007 Gelber Agreement by failing to refund that portion of paid fees related to the refused tax credit claims; (2) breached that same agreement by "identifying inappropriate alleged 'savings' that could never in fact be realized;" and (3) was unjustly enriched by "receiv[ing] moneys belonging to Plaintiff and benefit[t]ed from doing so." (Am. Compl., Docket No. 18.)

Notably, in June 2013, after this action was commenced, Plaintiff filed a request for conciliation with the NYSDTF appealing the department's findings. (LaChance Aff ¶ 13.) An offer of settlement by NYSDTF was subsequently accepted by Plaintiff and the appeal withdrawn. (*Id.* at ¶ 14.)

The parties both filed motions in the present action for summary judgment on October 15, 2013.

**DISCUSSION**

"A motion for summary judgment may properly be granted . . . only where there is no genuine issue of material fact to be tried, and the facts as to which there is no such issue warrant the entry of judgment for the moving party as a matter of law." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). A court's function on a summary judgment motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor*, 609 F.3d at 545 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (quoting *Anderson*, 477 U.S. at 248), *cert denied*, 540 U.S. 811 (2003). A court must also "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Further, where, as here, both parties move for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't*, 249 F.3d 115, 121 (2d Cir. 2001).

**A.    Alleged Breaches of the 2007 Gelber Agreement**

Defendant contends that it is entitled to summary judgment because the 2007 Gelber Agreement was automatically terminated by an express provision in the parties' 2011 Statement of Work Agreement. (Def's Mem of Law at 9-10.) Plaintiff responds that

the termination provision discharged only Plaintiff's obligations under the 2007 agreement, therefore Defendant's obligations remain enforceable. (Pl's Mem in Opp'n at 2-7.)

A fundamental principle of contract interpretation is that written "agreements are construed in accord with the parties' intent," the best evidence of which "is what they say in their writing." *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569, 780 N.E.2d 166 (2002).[5] "Thus, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Greenfield*, 98 N.Y.2d at 569. "A contract is unambiguous if the language it uses has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Greenfield*, 98 N.Y.2d at 569 (quoting *Breed v. Insurance Co. of N. Am.*, 46 N.Y.2d 351, 355, 385 N.E.2d 1280 (1978)). Whether a contract is ambiguous is a question of law for the court, determined by "looking within the four corners of the document, not to outside sources." *Kass v. Kass*, 91 N.Y.2d 554, 566, 696 N.E.2d 174 (1998). Indeed, extrinsic evidence of the parties' intent may not be considered unless an agreement is ambiguous. *Greenfield*, 98 N.Y.2d at 569. Instead, a court should:

> examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.

---

[5]Although the 2011 Master Service Agreement, which incorporates the Statement of Work, contains both an arbitration provision and a choice of law provision specifying that Delaware law applies, the parties apply New York law to all issues in the present motions. *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (where parties' briefs assume that New York law controls, such implied consent is sufficient to establish choice of law); *see also Lefkowitz v. Reissman*, No. 12 Civ. 8703(RA), 2014 WL 925410, *8 (S.D.N.Y. Mar. 7, 2014) (an arbitration provision should not be enforced absent a party's request).

9

> Form should not prevail over substance and a sensible meaning of words should be sought.

*Kass*, 91 N.Y.2d at 566.

Here, the relevant portion of the Statement of Work reads:

> This Statement of Work ("SOW" or "Statement of Work"), including any appendices, schedules, and/or attachments, documents the understanding between [Defendant] and Cascades USA Inc., ("Cascades["] or "Client") with respect to certain services to be performed by [Defendant] related to real estate tax services ("Services"). [Defendant] shall provide the Services pursuant to the provisions of this Statement of Work and [Defendant's] Master Services Agreement, which, together, describe our understanding with respect to the engagement ("Agreement"). **This SOW shall replace in its entirety the agreement dated and signed June 29, 2007 between The Gelber Organization and Cascades Inc. (The "Gelber Agreement"), which was assigned to [Defendant] in August 2008.** The sum of $210,532.00 due under said Gelber Agreement for credits for the New York Empire Zone Real Property Tax Credit for 2008 and 2009 remain due and payable. [Defendant], its successors, assigns, subsidiaries, affiliate corporations, officers and/or employees hereby release, remise and forever discharge Cascades Inc., and its affiliates for good and valuable consideration, including the payment of the sum of $210,532.00, from any and all obligations related to the Gelber Agreement or from any claim it could have against Cascades relating to the Gelber Agreement. For the purpose of clarity, it is clearly understood between the parties that other than the amount of $210,532.00 due and payable by Cascades Inc. to [Defendant], [Defendant] hereby agree[s] and acknowledge[s] that any amount owing or otherwise payable by Cascades Inc. under the Gelber Agreement as of the date hereof have been paid in full and no further amounts will be payable by Cascades Inc. **Upon signature of the Agreement, the Gelber Agreement shall be automatically terminated.**

(Leishman Decl Ex N (emphasis added).)

"[W]here the parties have clearly expressed or manifested their intention that a subsequent agreement supersede or substitute for an old agreement, the subsequent agreement extinguishes the old one and the remedy for any breach thereof is to sue on the superseding agreement." *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 100 A.D.2d 865, 867, 474 N.Y.S.2d 122 (N.Y.A.D. 2d Dep't 1984) (language that subsequent

"agreement was to be 'in lieu of' and would 'supersede' any other agreements" clearly and unequivocally extinguished prior agreement), *aff'd*, 64 N.Y.2d 930 (1985); *see Penguin Group (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (language that new contract "cancel[ed] and supercede[d]" prior contract precluded argument that prior agreement survived), *cert denied*, 556 U.S. 1253 (2009). Definitive language that the prior agreement is revoked, canceled, or superseded rescinds the prior contract even if the later contract does not pertain to precisely the same subject matter. *CreditSights, Inc. v. Ciasullo*, No. 05 CV 9345 (DAB), 2007 WL 943352, *6 (S.D.N.Y. Mar 29, 2007) (citing *Globe Food Servs. Corp. v. Con. Ed. Co. of N.Y.*, 184 A.D.2d 278, 279-80, 584 N.Y.S.2d 820 (N.Y.A.D. 1st Dep't 1992)). When a contract is so terminated, "any claim which either party may have had regarding any outstanding obligation thereunder is annulled unless it is expressly or impliedly reserved in the rescission agreement." *M.J. Posner Const. Co. v. Valley View Dev. Corp.*, 118 A.D.2d 1001, 1001-02, 499 N.Y.S.2d 997 (N.Y.A.D. 3d Dep't 1986); *see Mallad Const. Corp. v. County Fed. Sav. & Loan Ass'n*, 32 N.Y.2d 285, 293, 298 N.E.2d 96 (1973); *Bruce v. Martin*, 766 F. Supp. 200, 202 (S.D.N.Y. 1991).

Here, the parties agreed that the 2011 Statement of Work Agreement "replace[d] *in its entirety*" and "terminated" the "agreement dated and signed June 29, 2007."(Leishman Decl Ex N (emphasis added).) This is not the vague, boilerplate language that a new agreement "replaces all prior agreements" that, absent further elaboration, has been found ambiguous with respect to contracts on unrelated subject matters. *Globe Food Servs. Corp.*, 184 A.D.2d at 279-80. It is instead sufficiently definitive to establish the parties' specific intent to extinguish the 2007 Gelber Agreement. *Northville Indus. Corp.*, 100 A.D.2d at 867; *CreditSights, Inc.*, 2007 WL 943352 at *6. As

such, the fact that the earlier agreement addressed Defendant's evaluations of QEZE tax credits and the later agreement addressed evaluations of real estate property tax assessed valuations is of no moment. (See Pl's Mem in Opp'n at 4-5.)

Contrary to Plaintiff's further argument, the language cited from the 2011 Statement of Work Agreement cannot be read as "discharging Plaintiff, but not Defendant, from its obligations relating to the [2007 Gelber] Agreement." (Pl's Mem in Opp'n at 5.) Initially, a finding that the prior agreement was rescinded does not render either the statement that "[t]he sum of $210,532.00 due under said Gelber Agreement . . . remain[s] due and payable" by Plaintiff or the "clari[fication]" that all other past or future amounts owed by Plaintiff under that contract have been paid superfluous. (Pl's Mem in Opp'n at 5.) Instead, this language expressly reserves a singular payment obligation of Plaintiff, a reservation that was necessary in order to ensure it survived the simultaneous rescission of the prior contract. *Mallad Const. Corp.*, 32 N.Y.2d at 293. A similar reservation could have been made with respect to Defendant's refund obligation, particularly as Plaintiff (and only Plaintiff) was aware in March 2011 that the NYSDTF had questions about certain tax credits claimed for prior years, but was not. In contrast, a finding that Defendant was still bound by the 2007 Gelber Agreement cannot be reconciled with the plain language that this agreement was "replace[d] in its entirety" by the 2011 Statement of Work Agreement and terminated.[6] (Leishman Decl Ex N.)

---

[6]Notably, even if this provision was interpreted as merely terminating, but not superseding, the 2007 Gelber Agreement, a conclusion this Court does not reach in light of the "replace[ment]" language, there is no language in the 2007 agreement that the refund obligation survives termination, although such language appears in connection with other obligations in this contract. (*See* Leishman Decl Ex A (noting that Defendant's "non-disclosure obligation shall remain in effect indefinitely")); *see Pierson v. Empire State Land Assocs.*, 65 A.D.3d 1114, 1115, 886 N.Y.S.2d 411 (N.Y.A.D. 2d Dep't 2009) (termination of agreement extinguished indemnification provision where parties agreed that other specific obligations survived, but did not include indemnification obligation). To that end, Plaintiff itself argues that

This Court therefore finds that the 2011 Statement of Work agreement is not ambiguous or subject to misconception. It instead clearly reflects the parties' intent to extinguish all rights and duties under the 2007 Gelber agreement except Plaintiff's $210,532.00 payment obligation, which was expressly reserved and incorporated into the new agreement. *See Greenfield*, 98 N.Y.2d at 569-70. This absence of ambiguity, as well as the merger clause in the Master Service Agreement, precludes consideration of any extrinsic evidence of the parties' intent. (Leishman Decl Ex M ¶ 13); *see Schron v. Troutman Sanders LLP*, 10 N.Y.3d 430, 436, 986 N.E.2d 430 (2013) (a court is obliged to bar extrinsic evidence of intent where a contract contains a merger clause). Thus, because no obligation or duty of Defendant under the prior agreement was incorporated into the March 2011 agreement, any breach of contract claim based on such an obligation was annulled upon the execution of this superseding agreement. *See Mallad Const. Corp.*, 32 N.Y.2d at 293; *M.J. Posner Const. Co.*, 118 A.D.2d at 1001-2. Further, the new fee structure does not impose any refund obligation on Defendant that could be found applicable to the rejected 2005-2009 tax credit claims. (Leishman Decl Ex N.) Accordingly, Defendant is entitled to summary judgment on Plaintiff's first and second causes of action without reaching the parties' arguments on the existence and fulfillment of any condition precedent to a refund or exclusiveness of remedy.

---

Defendant's refund obligation was not triggered until June 2011, after the March 2011 termination. (Pl's Mem in Opp'n at 9.)

**B.     Unjust Enrichment Claim**

Defendant also contends that Plaintiff's third cause of action for damages under an unjust enrichment theory is precluded by the existence of either the 2007 Gelber Agreement, if found to be enforceable, or the 2011 Statement of Work Agreement. (Def's Mem of Law at 16-17.)  A claim for unjust enrichment requires a showing that the defendant was enriched at the plaintiff's expense, and it would be against equity and good conscience to permit the defendant "to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182, 944 N.E.2d 1104 (2011) (internal quotation marks omitted); *Bristol Village, Inc. v. Louisiana-Pacific Corp.*, 916 F. Supp. 2d 357, 366 (W.D.N.Y. 2013).  As Defendant correctly states, recovery under this quasi-contractual theory is precluded by existence of enforceable written contract on the same subject matter.  *See Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388, 516 N.E.2d 190 (1987).

Plaintiff argues that recovery under an unjust enrichment theory is appropriate in the event this Court determines that the 2007 Gelber Agreement was rescinded (as it has). Plaintiff highlights case law holding that the doctrine of *quantum meruit*, or unjust enrichment, "allows a plaintiff to recover even where an express contract has been rescinded, is unenforceable or has been abrogated because it enforces the enriched party's implied promise to pay for benefits conferred by the plaintiff." *Eli Attia Architects v. Safra*, No. 94 CIV. 2928, 1996 WL 480721, *6 (S.D.N.Y. Aug. 23, 1996) (citing *Waldman v. Englishtown Sportswear, Ltd.*, 92 A.D.2d 833, 836, 460 N.Y.S.2d 552 (1st Dep't 1983)).

Here, however, Plaintiff's unjust enrichment argument is that it would be inequitable for Defendant to keep all of the bargained-for contingency fee because, contrary to its

obligation to identify only *eligible* tax credits, it also identified ineligible ones that would never benefit Plaintiff; therefore the actual value of Defendant's services was less than the fee paid. (Pl's Mem of Law at 20-21.)  This claim is identical to Plaintiff's second cause of action for breach of contract that, as concluded above, was annulled upon the execution of the new agreement. (Am. Compl. ¶¶ 40-44); *see M.J. Posner Const. Co.*, 118 A.D.2d at 1001-2; *Mallad Const. Corp.*, 32 N.Y.2d at 293.  Defendant is therefore correct that this matter is governed by the rescission provision in the 2011 Statement of Work Agreement.[7] Plaintiff cannot avoid this provision by reframing its breach of contract claim as one for unjust enrichment. *See generally Atlantic St. John, LLC v. Yeomans*, 26 A.D.3d 266, 267, 810 N.Y.S.2d 154 (N.Y.A.D. 1st Dep't 2006) (restyling of breach of contract claim as breach of fiduciary duty would improperly allow the plaintiff to circumvent contract's express closing conditions).  Accordingly, recovery under a quasi-contractual theory is inappropriate. *Clark-Fitzpatrick, Inc.*, 70 N.Y.2d at 388.

---

[7] In its opposition brief on this point, Plaintiff asserts, without elaboration, that the 2011 Statement of Work Agreement "was between Cascades USA Inc. and Defendant, not Plaintiff and Defendant." (Pl's Mem in Opp'n at 15.) Plaintiff refers to Cascades USA Inc. as its subsidiary, (*See, e.g.*, Aff of Marrouane Nabih ¶¶ 1, 11), and  New York law generally views parent corporations and subsidiaries as legally distinct. *Carte Blanche (Singapore) Pte. v. Diners Club Int'l*, 2 F.3d 24, 26 (2d Cir. 1993).  Plaintiff, however, neither develops this argument nor disputes that Cascades USA Inc. had the authority to enter into an enforceable agreement with Defendant modifying the terms of the 2007 Gelber Agreement. Notably, the 2007 agreement could only be modified by a writing signed by both *parties*, and a unilateral termination was only permissible in the 30 days prior to the agreement's biannual December 31st expiration date (the 2011 agreement was signed in March).  Further, Plaintiff's tax director, Simon LaChance, testified that, as indicated by his handwritten modification, he signed the 2007 agreement on behalf of Cascades Tissue Group in the U.S., which was not its own legal entity, but instead a division under Cascades USA. (LaChance Dep at 45-47, Leishman Decl Ex DD.)  As such, if Plaintiff Cascades Inc. was found to be a legally distinct entity from Cascades USA Inc. under New York Law, Plaintiff would arguably be without standing to bring the present breach of contract claims.

**CONCLUSION**

Plaintiff's breach of contract and unjust enrichment claims are barred by the rescission provision in the 2011 Statement of Work Agreement. Defendant is therefore entitled to summary judgment in its favor and dismissal of the Amended Complaint.

**ORDERS**

Based on the foregoing, it hereby is ORDERED that Defendant's Motion for Summary Judgment (Docket No. 42) is GRANTED, Plaintiff's Motion for Summary Judgment (Docket No. 44) is DENIED, and the Amended Complaint is dismissed in its entirety.

The Clerk of the Court is directed to enter judgment in favor of defendant, and to close this case.

SO ORDERED.


Dated: August 6, 2014
       Buffalo, New York

　　　　　　　　　　　　　　　　　　　　　　　_____\s\ John T. Curtin_____
　　　　　　　　　　　　　　　　　　　　　　　　　　　　JOHN T. CURTIN
　　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge